**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-693 (TFH)** |
| **v.** | : | |
| | : | |
| **MARK KULAS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing. The United States urges the Court to sentence defendant Mark Kulas to 14 days of imprisonment, 36 months of supervised probation to include 60 hours of community service, and payment of $500 in restitution.

**I.      Introduction**

The defendant and his brother, Christian Kulas (charged in Case No. 1:21-cr-397), participated in the January 6, 2021, riot at the United States Capitol—a violent mob attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage. The defendant pleaded guilty on December 6, 2021, to one count of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in the Capitol Building).

During the riot on January 6, 2021, the defendant: entered the U.S. Capitol Building with a large group of rioters at the Senate Wing Door, where doors been forced open and windows broken around 13 minutes earlier; watched and smiled as other rioters forcefully broke open

Rotunda doors inside the U.S. Capitol Building; took photographs while unlawfully inside the U.S. Capitol Building; spent around 25 minutes inside the U.S. Capitol Building; and entered the building a second time (for around a minute) two minutes after first departing.  The defendant did not personally engage in violence or destroy property, but he was a willful part of the mob that disrupted the Congressional proceedings that day.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

## II.     Factual and Procedural Background

At the plea hearing on December 6, 2021, the defendant admitted to certain background facts regarding the riot that occurred at the U.S. Capitol Building on January 6, 2021, including that a large group of rioters breached law enforcement barricades and entered restricted areas, assaulted law enforcement, damaged government property, and caused evacuation of the chambers and delay of the Congressional proceedings.  (Dkt No. 10 at 1-3.)

The prior day, on January 5, 2021, the defendant travelled by air from Illinois to Washington, D.C., with his brother Christian Kulas, and they stayed at the Trump International Hotel in downtown Washington, D.C.

On the morning of January 6, 2021, the defendant's brother Christian Kulas took video footage of the "Stop the Steal" rally near the National Mall, and Christian Kulas later broadcast it to his Instagram social media account.  (Screenshots from social media video footage, attached as Exhibit A).  The defendant and his brother subsequently walked with a large group of individuals

onto the grounds of the U.S. Capitol and towards steps leading to the entrance of the building. (Photo attached as Exhibit B.)[1]



Individuals nearby were scaling walls leading towards the entrance of the U.S. Capitol Building (photo attached as Exhibit C), and Christian Kulas recorded video footage of the climbers and published it to his social media account (Exhibit A at 2).

---

[1] Defendant Mark Kulas was wearing a red hat with white writing, and had short hair.  Christian Kulas was wearing a dark hat with orange writing and had long hair.





The defendant and his brother walked up steps of the U.S. Capitol Building with a large group of rioters; Christian Kulas recorded video footage of himself laughing and published it to his social media account (Exhibit A at 3-4).



The defendant and Christian Kulas entered the U.S. Capitol Building with a large group of rioters at around 2:26 p.m. through the Senate Wing Doors, which around 13 minutes earlier been broken open by other rioters.  (Photo attached as Exhibit D.)



They watched as rioters spoke with law enforcement at around 2:30 p.m. in a hallway "OAP Corridor" (photo attached as Exhibit E), and they made their way to the Capitol Rotunda by around 2:35 p.m. (photo attached as Exhibit F).[2]





---

[2] Law enforcement located photographs taken inside the Capitol Rotunda on Mark Kulas' cloud-based storage account. (Photo attached as Exhibit G.)

At around 2:36 p.m., the defendant and Christian Kulas walked with a large group of rioters from the Capitol Rotunda to the Rotunda lobby.  (Photos attached as Exhibit H.)



There, the defendant and Christian Kulas watched as a throng of other rioters used bodily force in an effort to force open a door.  (Photos attached as Exhibit I.)  (The surveillance video footage demonstrates that neither brother participated in the use of physical force to open the door.)  The throng of other rioters succeeded in breaking open the door, and Christian Kulas raised his arms to cheer; both brothers smiled and then walked away.  (Exhibit I at 3-4.)







The defendant and Christian Kulas next walked through a connecting hallway at around

2:39 p.m. with a large group of rioters (photo attached as Exhibit J), and made their way to the

Statuary Hall, where Christian Kulas used his phone to take video that he later posted to social

media.  (Exhibit A at 5; photos attached as Exhibit K.)





The brothers then spent several minutes walking around the area of the East Stairs and

nearby hallways.  (Photos attached as Exhibit L.)



At around 2:50 p.m., the defendant and his brother left the U.S. Capitol Building through the Upper House Door.  (Photos attached as Exhibit M.)  The brothers then re-entered the building through the same Upper House Door around two minutes later, at 2:52 p.m.  (Photos attached as Exhibit N.) [3]



---

[3] The photos at 2-3 of Exhibit N are screenshots taken from a video posted online at: https://rumble.com/vcydy7-nemos-news-network-exclusive-storming-dc-capitol-jan-6-2021.html, starting at around the 2:40 timing mark.



The online video referenced in footnote 3 indicates that alarm sirens were sounding at this time and that, when the brothers re-entered the building, they were informed that a person had been shot.  The brothers departed the Upper House Door for the second time around a minute after entering, at around 2:53 p.m.  (Photos attached as Exhibit O.)[4]



---

[4] The photos at 2-3 of Exhibit O are also screenshots taken from the video referenced in note 3 above.





The defendant and Christian Kulas flew back to Illinois on January 7, 2021.

The defendant was interviewed by law enforcement at his parents' residence on June 8, 2021, the date that Christian Kulas was placed under arrest.  The defendant stated that he and his brother flew to Washington, D.C., on January 5 in order to attend the Trump rally scheduled for January 6, and that they flew back to Illinois on January 7.  He stated that the two brothers travelled alone and did not meet up with any other people or groups while in Washington.  The defendant stated that he and Christian Kulas marched with the crowd towards the U.S. Capitol Building after the rally, and that he did not see barricades and did not hear police giving any orders.  The

defendant described spending approximately 30 minutes walking around inside the U.S. Capitol Building, and that he took pictures with his phone.  He said that the brothers left after learning that someone inside had been shot.  The defendant identified himself and Christian Kulas from four photographs shown to him by law enforcement.

The defendant was arraigned on a one-count information on December 6, 2021, charging him with one violation of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).  (Dkt No. 1.)  That same day, the defendant pleaded guilty to the offense charged pursuant to a plea agreement.  (Dkt No. 9.)  Also on December 6, 2021, Christian Kulas pleaded guilty to the same offense.  (Case No. 1:21-cr-397, Dkt No.26.)  The sentencing hearing in both cases is scheduled for April 26, 2022.

### III.    Statutory Penalties

The statutory maximum penalty for a violation of 40 U.S.C. § 5104(e)(2)(G) is six months of imprisonment and a fine of $5,000.  The Court may impose a term of probation of up to five years under 18 U.S.C. § 3561.  The defendant must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

18 U.S.C. § 3553(a) requires the Court to consider a number of factors in determining the particular sentence to be imposed.  *United States v. Gall*, 552 U.S. 38, 49-50.  Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  The § 3553(a) factors include: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to

impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public, and provides the defendant with needed educational or vocational training and medical care; and (4) the need to avoid unwarranted sentence disparities among defendants with similar records convicted of similar conduct.

### A.  The Nature and Circumstances of the Offense

The violent mob attack on the U.S. Capitol, on January 6, 2021, was an attack on law enforcement, on public servants, and on the peaceful transfer of power.

Each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

The Court should additionally each defendant's conduct on a spectrum in determining a fair and just sentence, and should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition.  While these factors are not exhaustive

14

nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. The absence of violent or destructive acts on the part of a defendant is not a mitigating factor, as such conduct would have justified additional charges.

The defendant and his brother Christian Kulas engaged in serious criminal misconduct on January 6, 2021, when they unlawfully joined the mob of rioters at the U.S. Capitol Building.  The defendant entered the U.S. Capitol Building with a large group of rioters at the Senate Wing Door, where 13 minutes earlier the doors had been forced open and windows broken.  He walked around with his brother and watched as other rioters spoke with law enforcement officers in a hallway. The defendant also watched and smiled as a throng of other rioters forcefully broke open a door in the Rotunda Lobby (the defendant did not use physical force).  Despite witnessing such conduct, the defendant did not quickly depart the building; he subsequently walked through the Statuary Hall and walked around the East Stairs area.  The defendant spent around 25 minutes inside the U.S. Capitol Building, and he briefly (for around a minute) entered the building a second time a couple minutes after initially departing.

### B.  The History and Characteristics of the Defendant

The defendant has no prior arrests or criminal convictions.  He lives with his parents and appears to have family support in the community.  He is a high school graduate with a college degree, and he has a history of employment.  The defendant did the right thing by accepting responsibility for his misconduct by pleading guilty.

The government's sentencing recommendation is also informed by the significant and long-standing mental health and physical health issues discussed in the Presentence Investigation Report at 8-9.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

In the unique circumstances of this case, a 14-day term of imprisonment and a 36-month term of supervised probation with community service will sufficiently deter the defendant from

17

future misconduct.  The defendant's actions on January 6th were inexcusable, but the Court should consider all the circumstances including, among others, the absence of physical violence or destruction of property; the absence of evidence of any prior planning to riot; the early acceptance of responsibility; and the mental health issues discussed in the Presentence Investigation Report.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[6]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants like the defendant here will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not necessarily become the default.[7]  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."  *United*

---

[6]  Attached as Exhibit P is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[7]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

*States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.'  And I agree with that.  Judge Hogan said something similar.") (statement of Judge Friedman).

Individuals who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Although all the other defendants discussed herein participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he or she remained inside, the nature of any statements made (on social media or otherwise), whether he or she destroyed evidence of participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006).  "The most a judge

can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed in comparable cases listed in Exhibit P, including, among others:

*United States v. Glenn Croy*, 1:21-cr-162 (BAH) (defendant sentenced to 14 days of community confinement, three months of home detention, and three years of probation) –

Defendant entered building after watching law enforcement attempting to keep rioters away with tear gas; walked through Crypt; joined a crowd that forced a line of law enforcement officers to retreat; took video footage of rioters defacing government property; left building and re-entered around 40 minutes later; boasted on social media that he "stormed the Capitol"; minimized his misconduct in social media posts.

*United States v. Brian McCreary*, 1:21-cr-125 (BAH) (violation of 18 U.S.C. 1752) (defendant sentenced to 42 days of intermittent jail, two months of home detention, three years of probation) – Defendant was among first 30 rioters to enter building; climbed a crowd control fence using it as a ladder; filmed rioters harassing and chasing police; left and re-entered building; spent around 30 minutes inside.

*United States v. Robert Reeder*, 1:21-cr-166 (TFH) (defendant sentenced to three months of imprisonment) – Defendant took video footage of rioters climbing scaffolding and breaching doors; celebrated that thousands of people were fighting despite getting tear-gassed; left and re-entered building; recorded an assault on law enforcement; recorded a mob of rioters chanting "Hang Mike Pence".

*United States v. Troy Williams & Dalton Crase*, 1:21-cr-82 (CJN) (defendants sentenced to 15 days of intermittent incarceration and 36 months of probation) – Defendants entered building after seeing violence against law enforcement; left and re-entered building; observed violence inside building; did not depart until tear gas and flash grenades were deployed.

*United States v. Andrew Hatley*, 1:21-cr-98 (TFH) (defendant sentenced to three years of probation) – Defendant climbed through broken window at Senate Wing Door; left the building through the broken window for around two minutes; re-entered the building through the same broken window; took photos in the Crypt; spent around 15 minutes inside the building.

21

*United States v. Thomas Fee*, 1:21-cr-133 (JDB) (defendant sentenced to 24 months of probation) – Defendant was a retired firefighter who entered Senate Wing Doors; moved a wooden stand out of the way so that other rioters could enter; waved other rioters on to come through the broken window; directed rioters on where to go; left building for around 35 seconds and then re-entered; walked through Crypt and Rotunda; spent 30-40 minutes in building.

*United States v. Lori Vinson & Thomas Vinson*, 1:21-cr-355 (RBW) (both defendants sentenced to five years of probation) – Defendants climbed through scaffolding to reach U.S. Capitol Building; entered Senate Wing Door five minutes after it was breached; were in the front of a line in the Crypt that rushed forward as law enforcement was overwhelmed by crowd; stood in the OAP Corridor as rioters spoke with law enforcement and walked towards the police as the police walked backwards; entered Rotunda; watched from the Rotunda Lobby as a throng of rioters pushed against the Rotunda Lobby doors, forcing the doors to open; took video of the Rotunda Lobby breach; boasted on social media after the riot; conducted media interview after riot minimizing the misconduct; and spent around 35 minutes inside building.

*United States v. Kenneth Reda*, 1:21-cr-452 (TFH) (defendant sentenced to two months of home detention and three years of probation) – Defendant expressed prior intention to storm the House during electoral vote certification; recorded video footage and published it showing his efforts to enter the Rotunda door during; stood mere feet away from violent efforts by clear the Rotunda; filmed a video urging rioters on by shouting "Let's go to the House"; spent around 10 minutes inside the building.

*United States v. Anthony Mariotto*, 1:21-cr-94 (RBW) (defendant sentenced to three years of probation) – Defendant entered building through Senate Wing Doors; entered the Senate Gallery; video-recorded rioters assaulting police; watched as a line of rioters pushed past police in

the Crypt; attempted to open multiple closed doors; watched and recorded video of Rotunda Lobby

breach; minimized his misconduct in a post-arrest media interview.

We also note that the defendant engaged in similar conduct as his brother Christian Kulas,

with the exception that the defendant does not appear to have posted photos or videos taken inside

the U.S. Capitol Building to a public social media account.  This aggravating factor on the part of

Christian Kulas may be offset in part by Christian Kulas' comparatively more serious physical and

mental health issues, that are long-standing and ongoing as discussed in the Presentence

Investigation Reports.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of

several factors that must be weighted and balanced," and the degree of weight is "firmly committed

to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir.

2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that

"different district courts may have distinct sentencing philosophies and may emphasize and weigh

the individual § 3553(a) factors differently; and every sentencing decision involves its own set of

facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545

F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—

differently from the Sentencing Guidelines range, differently from the sentence an appellate court

might have imposed, and differently from how other district courts might have sentenced that

defendant."  *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence" – "a period of incarceration followed by

period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation

omitted) – for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see*

*United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[8] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by

---

[8] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[9]

As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of

probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of

probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced

to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant

is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different

offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D.

Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight'

imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress

considered adding the following sentence to the end of Section 3561(a)(3): "However, this

paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense

if the defendant has been sentenced to a term of imprisonment at the same time for another such

offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section

3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing

language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form,

therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation

unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a

different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

---

[9] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any
other sentence."  18 U.S.C. § 3551(b).

### 2.   *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same

time to a term of imprisonment for the same or a different offense that is not a petty offense."  18

U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to

impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL

768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.

*See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to

impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be

sentenced to a period of continuous incarceration and a term of probation.  *See United States v.*

*Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted

of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.*

at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)

"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term

of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal

Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in*

*conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the

defendant is being sentenced for a petty offense, a trial court may properly sentence such individual

to a term of continuous imprisonment for a period of time, as well as a sentence of probation.")

(citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th

ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time

to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only

"different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section

3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state

27

"the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

30

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. The defendant here pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1. Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[10]

---

[10] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

2.   *Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[11]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical

---

[11] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in this case given the requested 14-day imprisonment sentence.

**VI.    Conclusion**

In light of all the circumstances, a just an appropriate sentence would include 14 days of imprisonment, 36 months of supervised probation to include 60 hours of community service, and payment of $500 in restitution.  Such a sentence will protect the community, promote respect for the law, and deter future crime by imposing restrictions on liberty as a consequence of the defendant's behavior, while recognizing the defendant's acceptance of responsibility and the physical and mental health issues discussed in the Presentence Investigation Report.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:    _/s/_____
MICHAEL J. FRIEDMAN
Assistant United States Attorney
NY Bar 4297461
601 D Street, N.W.
Washington, DC 20530
Michael.Friedman@usdoj.gov
(202) 252-6765